Donna FLANAGAN–UUSITALO,
Plaintiff,

v.

D.T. INDUSTRIES, INC., Pharma
Group, Inc., and Lakso Company
Defendants.

No. CIV.A.99–40001–NMG.

United States District Court,
D. Massachusetts.

Dec. 20, 2001.

Gary H. Goldberg, Worcester, MA, for plaintiff.

James E. Wallace, Jr., Bowditch & Dewey, Worcester, MA, Thomas O. McCarthy, McMahon, Berger, Hannam Linihan, Cody & McCarthy, St. Louis, MO, for defendants.

## MEMORANDUM AND ORDER

GORTON, District Judge.

Following a number of adverse employment actions, plaintiff, Donna Flanagan–Uusitalo ("Flanagan"), filed suit against defendants, D.T. Industries, Inc., Pharma Group, Inc. and Lakso Company, in Massachusetts state court, alleging 1) sex discrimination, 2) handicap discrimination and 3) retaliation in violation of the Massachusetts discrimination statute, M.G.L. c. 151B. On January 4, 1999, the defendants removed the case to this Court on diversity grounds and, more recently, have filed the pending motion for summary judgment (Docket No. 37).

### I. *Factual Background*

For purposes of this motion for summary judgment only, the facts are stated as alleged by the plaintiff, non-moving party.

Defendant D.T. Industries ("DTI") is a publicly held corporation organized into three groups of companies: the Packaging Group, the Automation Group and the Components Group. The first of those groups does business as Pharma Group,

Inc. ("Pharma") and is a wholly-owned subsidiary of defendant DTI. Pharma is engaged in the manufacture of processing and packaging systems primarily for the pharmaceutical industry. In February of 1995, Pharma acquired defendant Lakso Company ("Lakso") and has since operated Lakso's Leominster, Massachusetts facility as an unincorporated division. Pharma has three additional unincorporated divisions: Stokes–Merrill Co., Kalish Co. and Swiftpak Co. *See* Corporate Structure Diagram attached to this Memorandum & Order.

Plaintiff Flanagan was employed by Lakso as its "Accounting Manager" from 1983 until its acquisition by DTI/Pharma after which her title was changed to "Controller." During the acquisition of Lakso, she was exposed to a sexually hostile work environment. Specifically, she claims that Steve Gore, President of DTI, and Joe Mallee, President of Stokes–Merrill, made comments that Flanagan was being reviewed by corporate personnel on the basis of her gender and her appearance and that comments were made that she was sleeping with her boss at Lakso. Flanagan expressed her concerns to both Mallee and Stan Burd, Corporate Controller for Pharma, but was advised that "this was the way the company operated."

In September 1996, Flanagan interviewed for the newly created the position of Packaging Group Controller for Pharma. The position reported to both Burd and Graham Lewis, Packaging Group President. She was selected for the position over the objections of Lewis. Her annual salary was increased from $60,000 to $66,000 and she was entitled to a bonus based upon Pharma's success. Flanagan later learned that similarly-situated male controller who reported to her received a comparable, if not higher, salary. Flanagan's responsibilities as Packaging Group

Controller included supervising the controllers of Pharma's unincorporated divisions but she also continued to perform her duties as Controller for Lakso.

Flanagan claims that, during her interview for Group Controller, Lewis made inappropriate comments about her style of dress and the manner in which she crossed her legs. During a business meeting in November of 1996, Lewis subjected Flanagan to discriminatory remarks. In front of her colleagues, he commented that she and a co-worker were "lovebirds." He also stated, at that same meeting, that she would not be successful as Group Controller because she was weak and would not be able to control the male employees.

In February of 1997, Flanagan suffered a heart attack. Prior to her official return to work, she performed work at home. Flanagan applied for and received short-term disability benefits through DTI's short-term disability program. At no time was she required to provide a medical verification of her heart attack or a return-to-work authorization. For approximately six weeks following her return to work, she attended cardiovascular rehabilitation three times per week.

During her recuperation and after returning to work in April, 1997, both Lewis and Burd directed Flanagan to focus on the Lakso Controller position and less on the new Group Controller position. Flanagan resumed the air travel required as part of the Group Controller job in May, 1997.

In September of 1997, unbeknownst to Flanagan, DTI's Vice President of Finance decided to reorganize the Finance Department because the current management structure was no longer feasible due to the large number of subsidiaries. Accordingly, the position of Packaging Group Vice President of Administration was created to assume most of Burd's supervisory duties

as Corporate Controller with respect to the Packaging Group. Both the Corporate Controller and the Packaging Group Controller positions were therefore eliminated.

Notwithstanding the elimination of the Group Controller position, Flanagan continued to perform both her Lakso Controller and Group Controller duties through January, 1998. At that time, she first learned that the Group Controller position had been eliminated pursuant to the 1997 corporate reorganization. She also learned that DTI and Pharma had hired Jerome Kroll for the newly created Packaging Group Vice President of Administration. That position subsumed many, if not all, of her duties and reporting relationships as Group Controller. Despite the elimination of the Group Controller position, Flanagan's salary was not decreased.

In late 1997 or January, 1998, Jerry Scheminger was hired or transferred in to become the Vice President of Operations for Lakso, a position which had been vacant. Lewis had previously asked Flanagan to consider assuming responsibility for running the Lakso facility, but, although she expressed an interest in doing so, she was never interviewed or even informed that Defendants were recruiting for the Vice President of Operations position or that the position was available.

Flanagan received a bonus in 1997 for the preceding fiscal year which was inconsistent with her responsibilities as Group Controller. Rather, it was more in line with her duties as Lakso Controller. Other Group Controllers allegedly received much larger bonuses. When she questioned Lewis about the bonus, he indicated that it was reflective of her illness and not doing the Group Controller's job.

On February 17, 1998, Flanagan filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), alleging sexual harassment, sex discrimination and handicap discrimination. Since filing the MCAD complaint, Flanagan claims that her performance is "overly scrutinized" and that she is not consulted about important company issues.

In accordance with company policy and supported by medical documentation, Flanagan again obtained short-term disability benefits in May, 1998. On June 29, 1998, she received correspondence from Human Resources ("HR") indicating that she would henceforth be required to furnish additional documentation to support her continuation on the disability plan. No deadline was provided nor any indication given that her compensation under the plan would immediately cease.

On July 7, 1998, Flanagan was informed that her disability coverage was cancelled and that she would receive no further payments under the disability plan until satisfactory medical documentation was received. Flanagan asserts that male employees were not required to provide continuing medical documentation to support their disabilities. She notes that she herself was not required to do so when she obtained short-term disability benefits in 1997.

On July 9, 1998, the defendants, through HR, requested that Flanagan's physician answer various questions regarding her disability and work status. Her physician responded that her current stress level was having an adverse impact on her heart condition. One week later, apparently finding that answer insufficient, HR propounded additional questions to the physician, whereupon he examined Flanagan and responded, in writing, that she could return to work on a part-time basis. He also stated that he would re-evaluate the plaintiff in one month's time regarding her ability to work full-time. That same day, HR refused to allow Flanagan to return to

work part-time, although she had been allowed to do so while recuperating from her heart attack in 1997.

Denied disability benefits and part-time employment, Flanagan was forced to work full-time against her physician's advice. Full-time employment has allegedly caused Flanagan further health difficulties related to her heart.

Believing that she was being treated unfavorably as a result of filing her complaint, Flanagan filed a second complaint with the MCAD in November, 1998, alleging sex discrimination, handicap discrimination and retaliation.

On December 10, 1998, plaintiff filed a four-count complaint in Massachusetts Superior Court, Worcester County, alleging sex discrimination, handicap discrimination (two counts) and retaliation, all in violation of M.G.L. c. 151B.

About one month later, Flanagan became temporarily disabled due to work-related stress that affected her physical health. She applied for and was granted short-term disability leave. On February 5, 1999, she was informed by Kroll that unless she was able to return to work by February 19, 1999, her position would be filled. Kroll also informed her that her Family Medical Leave Act ("FMLA") time would be exhausted within the month. Flanagan contested the accuracy of defendants' calculations regarding her FMLA leave. In any event, on March 15, 1999, she was replaced as Controller for Lakso and shortly thereafter, she applied for and received long-term disability benefits.

In August, 1999, Plaintiff added a fifth count for retaliation pursuant to Fed. R.Civ.P. 15(d) to the complaint previously removed to this Court. As supplemented, the complaint states the following claims:

I. *Count I: Sex Discrimination:* Flanagan cites 1) her demotion from the Group Controller position, 2) terms and conditions of employment including salary, bonuses and disability leave, less favorable than those given to similarly situated male employees, and 3) restriction of her career opportunities.

II. *Counts II and IV: Handicap Discrimination:* Flanagan claims that defendants terminated her from the Group Controller position as a result of her heart condition either because they assumed she did not want to continue in that job or was unable to do so. She also cites the difficulty she had remaining on disability leave in 1998 and defendants' refusal to let her return on a part-time work status.

III. *Counts III and V: Retaliation:* Flanagan contends that the following constitute retaliation for her filing a complaint with the MCAD: 1) intense scrutiny of her employment, 2) the difficulty she had remaining on disability leave in 1998, 3) defendants' refusal to let her return to work on a part-time basis, 4) requiring her to return prematurely from disability leave in order to avoid being replaced, and 5) her ultimate replacement.

## II. *Summary Judgment Standard*

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (*quoting Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only where the

party opposing summary judgment provides evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists, summary judgment is appropriate. Notably, with respect to the instant suit, "summary judgment is disfavored in fact-intensive disparate treatment cases." *Daley v. Wellpoint Health Networks, Inc.*, 146 F.Supp.2d 92, 103 (D.Mass.2001).

### III. *Burden of Proof*

Flanagan's claims are brought under the Massachusetts Antidiscrimination Law, M.G.L. c. 151B. She has the burden of proving unlawful discrimination either by direct evidence or indirectly by circumstantial evidence. *Wynn & Wynn v. Massachusetts Com'n Against Discrimination*, 431 Mass. 655, 664, 729 N.E.2d 1068 (2000). When applying that statute to claims where, as here, there is no direct evidence of discrimination, the Massachusetts Supreme Judicial Court ("the SJC") follows the three-stage order of proof first set forth by the United States Supreme Court under the federal antidiscrimination provisions of Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Blare*

*v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440–41, 646 N.E.2d 111 (1995). The SJC is not, however, bound by interpretations of Title VII in construing Chapter 151B. *Id.* at 441, 646 N.E.2d 111.

Under the *McDonnell Douglas* analysis, the evidentiary framework shifts back and forth between the plaintiff and the defendant. However, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

At the first stage of the analysis, the plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff satisfies her burden, it will be presumed that the defendant engaged in discrimination. *Blare*, 419 Mass. at 440–41, 646 N.E.2d 111. The burden then shifts to the defendant to rebut that presumption by articulating a legitimate, non-discriminatory reason for its action. *Id.* If the defendant successfully does so, the presumption of discrimination drops from the case and the burden shifts back to the plaintiff to show that the defendant's articulated justification is merely pretextual. *Id.* at 443, 646 N.E.2d 111.

At the third stage of the analysis, the plaintiff must show that the reason for the employer's decision was unlawful discrimination. *Abramian v. President & Fellows of Harvard College, et al.*, 432 Mass. 107, 117, 731 N.E.2d 1075 (2000). The plaintiff may satisfy that requirement by showing that the reasons advanced by the employer for making the adverse decision are not true, or, in other words, are

merely a pretext. *Id.* Under Massachusetts law, the plaintiff is not required to show that the employer's reasons were a pretext for discrimination, but merely a pretext. *Lipchitz v. Raytheon Co.,* 434 Mass. 493, 501–2, 751 N.E.2d 360 (2001). If the plaintiff succeeds in establishing that the employer's reasons were false, the fact finder may, but is not required to, infer a discriminatory motive and enter judgment for the plaintiff. *Sanderson,* 530 U.S. at 147, 120 S.Ct. 2097; *Fite v. Digital Equipment Corp.,* 232 F.3d 3, 7 (2000); *Lipchitz,* 434 Mass. at 502, 751 N.E.2d 360.

■ A finding of pretext is not synonymous with a finding of discriminatory animus and causation, and does not thereby become the element of discriminatory animus and causation. *Weber v. Community Teamwork, Inc., et al.,* 434 Mass. 761, 776, 752 N.E.2d 700 (2001); *Lipchitz,* 434 Mass. at 502, 751 N.E.2d 360. A finding of pretext permits the fact finder to infer that the employer acted with discriminatory animus. *Id.* As stated in *Lipchitz:*

> Permitting, but not requiring the fact finder to draw the inference strikes the proper balance by holding the plaintiff to her ultimate burden without requiring her to produce direct evidence of discriminatory animus, a form of evidence that, we recognize, rarely exists.

434 Mass. at 501, 751 N.E.2d 360.

## IV. *Sex Discrimination*

### A. Standard

Massachusetts law makes it unlawful

> [f]or an employer, by himself or his agent, because of the . . . sex . . . of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of

employment, unless based upon a bona fide occupational qualification.

M.G.L. c. 151B, § 4(1).

### B. Plaintiff's Prima Facie Case of Sex Discrimination

■ To establish a prima facie case of discrimination, the plaintiff must show that:

> (1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly the equivalent qualifications.

*Duncan–Young v. Pine Street Inn,* 1997 WL 136337,*1, 1997 U.S. Dist. LEXIS 3435, *6 (D.Mass.1997). The plaintiff's burden of establishing a prima facie case of discrimination is not onerous. *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15 (1st Cir.1994); *Duncan–Young,* 1997 WL 136337, 2, 1997 U.S. Dist. LEXIS at *9.

There is no dispute about the first three criteria for the claim, but Defendants argue that the plaintiff has failed to establish a prima facie case of sex discrimination because she cannot show that she was replaced by an employee with roughly equivalent employment qualifications. The plaintiff responds that the defendants hired a replacement to perform similar duties to those she was employed to perform.

To determine whether a plaintiff has satisfied the fourth requirement for establishing a prima facie case of discrimination, the appropriate question is whether the employer hired "someone of roughly equivalent qualifications to perform substantially the same work." *Duncan–Young,* 1997 WL 136337, *2, 1997 U.S. Dist. LEXIS at

*8. Here, the plaintiff has adequately met her burden. The defendants contend that the plaintiff's position of Group Controller was eliminated due to the restructuring of the corporate groups within DTI. The plaintiff responds that she was not informed of the reorganization or the elimination of her position until months later.

█ As a result of the reorganization, the defendants hired Jerome Kroll to fill a new position entitled Vice President of Administration ("VPA"). The duties of the VPA and the Group Controller appear to be similar in many respects because they are cast in broad, general terms in their respective job descriptions. Corporate Controller Stan Burd stated in a company memorandum that the duties of the Group Controller include assisting with acquisition due diligence, financial review of group companies and maintaining the integrity of accounting systems. Another corporate document states that the duties of the VPA include acquisition assistance, assistance with audits and responsibility for divisional controllers. In addition, both positions report to the same supervisor. Although the positions differ in some respects, a reasonable jury could conclude that the persons in the two positions perform roughly the same duties.

Although the plaintiff and Kroll possessed different job qualifications, a colorable argument may be made that they were both qualified for the position. Kroll had earned a bachelor's degree in Business Administration with a major in Accounting and had spent eight years of his career in senior financial management of a manufacturing company.

The plaintiff, on the other hand, has not yet earned her college degree, but is pursuing a course in business administration and has completed several classes in accounting. The plaintiff has, however, had more experience working within the company. She served as the Accounting Manager for Lakso for seven years before being promoted to Controller for Lakso. During that time, she received favorable employment reviews.

A reasonable jury could find from this evidence that Kroll and the plaintiff were equally qualified for the position of VPA. *Lipchitz v. Raytheon Company*, 434 Mass. 493, 498, 751 N.E.2d 360 (2001)(performance evaluations suggesting that plaintiff was qualified to hold management position was sufficient evidence for jury to conclude that lack of formal qualifications was not the reason for the defendant's refusal to promote the plaintiff).

## C. Defendants' Burden to Produce a Non–Discriminatory Justification

The burden then shifts to the defendants to produce a legitimate, non-discriminatory reason for their decision. *Duncan*, 1997 WL 136337, *2, 1997 U.S. Dist. LEXIS at *9. The defendants here have adequately satisfied their burden. They contend that Flanagan's position was eliminated due to the reorganization of the corporate structure. This contention is supported by evidence that the significant growth of DTI rendered its management structure ineffective. In addition, the defendants' contention that they hired Kroll because they believed his formal education and extensive experience in financial management would be a better fit for the executive position of VPA is supported by evidence of Kroll's strong business background.

## D. Plaintiff's Burden to Show Pretext

The burden then shifts back to the plaintiff to prove that the defendants' actions were motivated by discriminatory animus. *Id.* As stated previously, showing that the employer's proffered reasons for its ac-

tions were merely a pretext is sufficient under Massachusetts law to support the inference of discriminatory animus. A plaintiff can establish pretext by showing that discriminatory comments were made by those in a decision-making position. *Dow v. Donovan*, 150 F.Supp.2d 249, 265 (D.Mass.2001); *Weber*, 434 Mass. at 775, 752 N.E.2d 700.

■ The plaintiff has produced evidence suggesting that the President of the Stokes–Merrill Division made a comment about her "sleeping with her boss." She has also offered to prove that the President of Pharma, Graham Lewis, made comments suggesting that she would not be able to perform her duties as Group Controller because of her gender. In addition, she testified that Lewis commented at a business meeting that she and a co-worker were "lovebirds." Construing the evidence in the light most favorable to the plaintiff, those comments could reasonably be considered by a jury to be evidence of pretext even though they may constitute "stray remarks." *Dow*, 150 F.Supp.2d at 265.

Because the plaintiff has produced sufficient evidence to enable a jury to find pretext, it is unnecessary to analyze the allegations of disparate treatment which seem to be unsupported by the evidence.

## V. *Handicap Discrimination*

### A. Standard

Massachusetts law provides that an employer may not:

> dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the

employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

M.G.L. c. 151B, § 4(16).

■ In order to establish a *prima facie* case of handicap discrimination in employment under Chapter 151B, the plaintiff must present credible evidence that 1) she is handicapped within the meaning of the statute, 2) she is qualified to perform the essential functions of the job with or without reasonable accommodation, 3) she was terminated or otherwise subject to an adverse action by her employer, and 4) she was replaced by a non-handicapped person or the position she had occupied remained open and the employer sought to fill it. *Dartt v. Browning–Ferris Indus., Inc.*, 427 Mass. 1, 2, 691 N.E.2d 526 (1998). The plaintiff is not required, as part of her *prima facie* case, to show that she was terminated "solely" because of her handicap. *Id.*

### B. Elimination of Group Controller Position

■ The plaintiff alleges that the defendants discriminated against her based on her handicap by eliminating her position as Group Controller. The defendants respond that Plaintiff cannot establish a prima facie case of handicap discrimination because she was not handicapped within the meaning of M.G.L. c. 151B § 4. Under the statute a handicap is:

> (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment. . . .

M.G.L. c. 151B, § 1(17). A heart condition such as that from which the plaintiff suf-

fered can qualify as a handicap under the statute. *Talbert Trading Co. v. MCAD*, 37 Mass.App.Ct. 56, 60–61, 636 N.E.2d 1351 (1994). In the case of a person who suffers heart disease, a presumption may be created that the condition substantially limits one or more of her major life activities. *Id.* Here, the plaintiff has produced evidence that her condition limited her major life activities by causing her anxiety, depression and chronic physical pain.

There is also evidence that the defendants regarded the plaintiff as having a handicap and believed that her condition adversely affected her employment capabilities. When the President of DTI learned of the plaintiff's temporary inability to travel, he allegedly stated that he wanted her removed from her job. Moreover, the plaintiff has produced evidence that the defendants told her to concentrate on only some of her duties.

The plaintiff suffers from a handicap within the meaning of the statute and has otherwise established a prima facie case of handicap discrimination by producing sufficient evidence from which a reasonable jury could infer that 1) she is a qualified handicapped person because she was able to perform the essential functions of Group Controller, 2) she suffered an adverse employment action, and 3) the defendants filled her position or its equivalent with a non-handicapped person.

### C. Defendants' Justification

As stated above, in reference to the plaintiff's sex discrimination claim, the defendants have produced legitimate, non-discriminatory reasons for eliminating the position of Group Controller.

### D. Pretext

To avoid summary judgment, the plaintiff must produce evidence from which a reasonable jury could infer that the defen-dants' reasons are merely a pretext. The plaintiff has satisfied that burden. In support of her allegations that the defendants eliminated her position because of her handicap, the plaintiff offers evidence that Lewis asked her if she were "up to" taking on her duties of Group Controller notwithstanding the fact that she had already been performing those duties. That line of questioning could be found to imply that her supervisors believed she was unable to perform her duties adequately. In addition, she has produced evidence that the President of DTI wished to have her terminated when he learned that she could not travel temporarily.

### E. Failure to Accommodate

▇▇▇ Under M.G.L. c. 151B, an employer "must make reasonable efforts to accommodate the particular needs of qualified handicapped individuals." *Petsch–Schmid v. Boston Edison Co.*, 914 F.Supp. 697, 703 (D.Mass.1996). In order to state a claim for failure to reasonably accommodate and to survive a motion for summary judgment, a plaintiff must furnish probative evidence:

> 1) that she is a qualified individual with a disability, 2) that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations, and 3) that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.

*Rennie v. United Parcel Service*, 139 F.Supp.2d 159, 165–66 (D.Mass.2001).

▇▇▇ There is a genuine issue of material fact as to whether the defendants failed to accommodate the plaintiff's handicap. The plaintiff has produced a letter from her physician dated July 16, 1998 stating, "it would be reasonable at this point to have her return to work on a part

time basis." She has also submitted a reply letter from Marilyn K. Pummell, the Director of Human Resources at DTI, dated the same day, stating that, although the doctor authorized the plaintiff to work on a part time basis, Pummell understood the plaintiff to interpret "part-time basis" as working full days. The plaintiff thereafter returned to work on a full-time basis. A reasonable jury could infer from this evidence that the defendants did not make a reasonable effort to accommodate the plaintiff's medical needs.

## VI. *Retaliation*

Under Massachusetts law, it is unlawful for an employer:

> to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

M.G.L. c. 151B, § 4(4). The plaintiff bears the burden of proving:

> that [he] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination, that [he] acted reasonably in response to [his] belief, and that the [employer's] desire to retaliate against [him] was a determinative factor in its decision to terminate [his] employment.

*Abramian,* 432 Mass. at 121, 731 N.E.2d 1075 (*quoting Tate v. Department of Mental Health,* 419 Mass. 356, 364, 645 N.E.2d 1159 (1995)).

■ To establish a *prima facie* case of retaliation, Flanagan must show that 1) she engaged in protected conduct, 2) she suffered an adverse employment action, and 3) a causal connection existed between the protected conduct and the adverse action. *McMillan v. Mass. Soc., Prev. of Cruelty To Animals,* 140 F.3d 288, 309 (1st Cir.1998) (stating standard under federal

or Massachusetts law); *Riebold v. Eastern Cas. Ins. Co.,* 1999 WL 140419, *17 (Mass.Super. March 2, 1999). There must be at least some evidence that the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a role in the adverse employment actions alleged. *Lewis v. Gillette, Co.,* 22 F.3d 22, 24 (1st Cir.1994). Notably, the jury may find impermissible retaliation even if there was no discrimination. *Abramian,* 432 Mass. at 122, 731 N.E.2d 1075.

There is no dispute that Flanagan engaged in protected activity by filing complaints with the MCAD. *Reibold,* 1999 WL 140419 at *17. Furthermore, in her complaint, the plaintiff identifies two adverse employment actions: 1) the imposition of a requirement that she return from her disability leave or advise the company of her disability before a certain date or be replaced, and 2) her discharge shortly thereafter. In her Opposition brief, the plaintiff alleges three additional, adverse employment actions: 1) scrutiny of her request for short term disability in June of 1998, 2) denial of her request for part-time status and 3) excessive scrutiny of her work.

■ The plaintiff fails to establish a prima facie case for retaliation with respect to the two adverse employment actions identified in her complaint. Those actions, if proved, would constitute adverse employment actions because they constitute a change in working conditions that create a material disadvantage in the plaintiff's employment. *MacCormack v. Boston Edison Co.,* 423 Mass. 652, 662, 672 N.E.2d 1 (1996). The plaintiff cannot, however, establish a causal connection between those actions and the filing of her discrimination claims which is required in an action for retaliation. *Lewis v. Gillette, Co.,* 22 F.3d 22, 25 (1st Cir.1994); *MacCormack,* 423 Mass. at 662, 672 N.E.2d 1.

 

The most persuasive evidence that the alleged adverse employment actions were motivated by retaliation is that the defendants previously allowed her to take longer disability leaves in 1997 and 1998 without requiring her to state whether she intended to be out of work indefinitely. Plaintiff's admission that she was able to take a longer leave of absence in 1998 illustrates that the 1999 requirement was not retaliatory, because her leave of absence in 1998 occurred after she filed her discrimination claims.

With respect to the plaintiff's claims of the defendants' excessive scrutiny of both her employment and her request for short term disability leave in 1998, she has failed to establish a prima facie case of retaliation. Such scrutiny does not constitute adverse employment action which is one that imposes a "change in working conditions that materially disadvantages an employee." *MacCormack*, 423 Mass. at 662, 672 N.E.2d 1. The plaintiff has offered no objective evidence that she has been "disadvantaged with respect to salary, grade, or other objective terms and conditions of employment." *Id.* at 663, 672 N.E.2d 1. The only evidence of excessive scrutiny is plaintiff's subjective beliefs.

Finally, the plaintiff has failed to show that the defendants' requirement that she work full days was retaliatory because she has failed to establish a causal connection between her filing of a discrimination claim and the defendants' alleged requirement that she work full-time. The only evidence offered by the plaintiff is that the alleged denial of her part-time work request occurred after she filed a discrimination complaint. The mere fact, however, that "one event followed another is not sufficient to make out a causal link." *MacCormack*, 423 Mass. at 663, 672 N.E.2d 1.

**ORDER**

For the reasons set forth in the memorandum above, the defendants' motion for summary judgment (Docket No. 37) is, with respect to Counts III and V, ALLOWED and is, with respect to all other counts, DENIED.

So ordered.